**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————

No. 17-3010

———————————

BRADLEY BEERS;
JOSEPH DIVITA*,

Appellants

v.

ATTORNEY GENERAL UNITED STATES OF AMERICA;
DEPARTMENT OF JUSTICE; UNITED STATES BUREAU
OF ALCOHOL TOBACCO FIREARMS & EXPLOSIVES;
THOMAS E. BRANDON, Deputy Director of the ATF;
RONALD B. TURK, Associates Deputy Director/ Chief
Operating Office of the ATF; FEDERAL BUREAU OF
INVESTIGATION; DIRECTOR FEDERAL BUREAU OF
INVESTIGATION; UNITED STATES OF AMERICA;
PENNSYLVANIA ATTORNEY GENERAL;
PENNSYLVANIA STATE POLICE; TYREE BLOCKER,
Commissioner of the Pennsylvania State Police;
EDWARD DONNELLY, Bucks County Sheriff;
BUCKS COUNTY SHERIFFS DEPARTMENT; BUCKS
COUNTY DISTRICT ATTORNEY

*(Party Dismissed Pursuant to Court Order dated 02/13/18)

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D. C. Civil No. 2-16-cv-06440)
District Judge: Honorable Legrome D. Davis

Argued on July 12, 2018

Before:  SHWARTZ, ROTH and RENDELL, <u>Circuit Judges</u>

(Opinion filed: June 20, 2019)

Michael P. Gottlieb                    (**ARGUED**)
Vangrossi & Recchuiti
319 Swede Street
Norristown, PA 19401

        Counsel for Appellant

Tyce R. Walters                    (**ARGUED**)
Patrick Nemeroff
Michael S. Raab
United States Department of Justice
Civil Division
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

        Counsel for Appellees

---

OPINION

---

ROTH, <u>Circuit Judge</u>

## **INTRODUCTION**

Federal law prohibits the possession of firearms by anyone who has previously been adjudicated as mentally ill or committed to a mental institution. Bradley Beers challenges this law on the ground that, as applied to him, it violates the Second Amendment.

Mentally ill individuals have traditionally been prohibited from possessing guns because they were considered to be a danger to themselves and to others. Beers cannot factually distinguish himself from this historically-barred class because a court has determined that Beers was a danger to himself and thereby required that he be committed to a mental institution. Beers contends, however, that, although he was previously involuntarily institutionalized, he has since been rehabilitated. For this reason, he argues that his rehabilitation distinguishes his circumstances from those in the historically-barred class.

The issue that we must consider then is whether passage of time and evidence of rehabilitation are relevant to our inquiry concerning the constitutionality of the prohibition of the possession of firearms by Beers.

3

**BACKGROUND**

Beers was involuntarily committed to a psychiatric inpatient hospital on December 28, 2005, after he told his mother that he was suicidal and put a gun in his mouth. Beers's mother was particularly concerned because Beers kept a gun in his room and had the means to kill himself. Beers was involuntarily admitted to the hospital for up to 120 hours pursuant to Section 302 of Pennsylvania's Mental Health Procedures Act (MHPA).[1] The examining physician determined that Beers was suicidal and that inpatient treatment was required for his safety.

On December 29, 2005, and again on January 3, 2006, a Pennsylvania court extended Beers's involuntary commitment pursuant to Sections 303 and 304 of the MHPA, concluding that he presented a danger to himself or to others.[2] At the court hearings for the extensions, the Bucks County

---

[1] 50 Pa. C.S. § 7302 ("Emergency examination may be undertaken at a treatment facility upon the certification of a physician stating the need for such examination . . ..").

[2] *See* 50 Pa. C.S. § 7303(a) ("Application for extended involuntary emergency treatment may be made for any person who is being treated pursuant to section 302 whenever the facility determines that the need for emergency treatment is likely to extend beyond 120 hours."); *id.* § 7304(a)(2) ("Where a petition is filed for a person already subject to involuntary treatment, it shall be sufficient to represent, and upon hearing to reestablish . . . that *his condition continues to evidence a clear and present danger to himself or others* . . ..." (emphasis added)).

Court of Common Pleas determined that Beers was "severely mentally disabled and in need of treatment."[3]

Beers has had no mental health treatment since 2006. A physician who examined Beers in 2013 opined that Beers was able "to safely handle firearms again without risk of harm to himself or others."[4] Shortly after he was discharged from his commitment in 2006, Beers attempted to buy a firearm but was denied because a background check revealed that he had been involuntarily committed to a mental institution.

Beers subsequently filed a complaint in the United States District Court for the Eastern District of Pennsylvania, asserting that 18 U.S.C. § 922(g)(4),[5] the federal statute prohibiting him from possessing a gun, was unconstitutional as applied to him.[6] The government moved to dismiss the complaint.

Applying the two-part test derived from our rulings in *United States v. Marzzarella*[7] and *Binderup v. Attorney General*,[8] the District Court first determined that Beers could

---

[3] App. 8-9; Supp. App. 9-10.

[4] App. 10.

[5] "It shall be unlawful for any person . . . who has been adjudicated as a mental defective or who has been committed to a mental institution . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(4).

[6] Beers also asserted due process and equal protection violations. These claims were not raised on appeal.

[7] 614 F.3d 85 (3d Cir. 2010).

[8] 836 F.3d 336 (3d Cir. 2016).

not distinguish his circumstances from those of mentally ill individuals who were subject to the longstanding prohibitions on firearm possession. The court next held that, pursuant to our ruling in *Binderup,* evidence of Beers's rehabilitation was irrelevant; thus, Beers could not rely on such evidence to distinguish his circumstances. As a result, the court ruled that § 922(g)(4) did not impose a burden on conduct falling within the scope of the Second Amendment and was therefore constitutional as applied to Beers. The District Court dismissed Beers's complaint. Beers appeals the District Court's rejection of his as-applied Second Amendment challenge to § 922(g)(4).[9]

## DISCUSSION[10]

### I.       The Framework for Second Amendment Challenges

When a challenge is made to a law prohibiting the possession of firearms, we follow our rulings in *Marzzarella* and *Binderup*. Pursuant to these cases, we are required to

---

[9] While the government's motion to dismiss Beers's complaint in the District Court was still pending, a Pennsylvania court restored Beers's state law right to possess a firearm, pursuant to 18 Pa. C.S. § 6105(f), which allows the restoration of state gun ownership rights. Because § 6105(f) does not satisfy federal requirements allowing for acknowledgement by the federal government of the state's restoration of gun rights, Beers remains subject to the prohibition of § 922(g)(4). *See* Pub. L. No. 110-180 § 105, 121 Stat. 2559, 2569-70 (2008).

[10] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 2201, 2202, and 2412, and we have jurisdiction under 28 U.S.C. § 1291.

6

conduct a two-part inquiry. First, we look at the historic, traditional justifications for barring a class of individuals from possessing guns and ask whether the challenger can distinguish his circumstances from those of individuals in the historically-barred class. If the challenger makes such a showing, we proceed to the second step, which requires the government to demonstrate that the challenged law satisfies some form of heightened scrutiny.

### A. The Supreme Court's Decision in *District of Columbia v. Heller*

Our jurisprudence in Second Amendment cases is based on the Supreme Court's ruling in *District of Columbia v. Heller*.[11] The Second Amendment provides that "[a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[12] *Heller* involved a challenge to a District of Columbia law that banned handgun possession, including the possession of handguns in the home. The Supreme Court held in *Heller* that the Second Amendment guarantees to an individual the right – not unlimited – to keep and bear arms.[13] The Court recognized that "[a]t the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'"[14] Because the District of Columbia law in question violated this core Second Amendment right, the Court ruled that it was unconstitutional.

---

[11] 554 U.S. 570 (2008).
[12] U.S. CONST. amend. II.
[13] *Heller*, 554 U.S. at 595.
[14] *Binderup*, 836 F.3d at 343 (quoting *Heller*, 554 U.S. at 634-35).

7

However, in articulating the guarantee to keep and bear arms, the Supreme Court recognized that "the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."[15]  Indeed, nothing in *Heller*, according to the Court, "should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill."[16]  The Court therefore identified such prohibitions as "presumptively lawful," because they affect classes of individuals who, historically, have not had the right to keep and bear arms.[17]

**B.      The Third Circuit's Two-Part Test for Analyzing Second Amendment Challenges**

Our first occasion after *Heller* to decide a Second Amendment challenge involved a statute prohibiting the possession of handguns with obliterated serial numbers.  In *Marzzarella*, we applied a two-part test for evaluating Second Amendment challenges:  "First, we ask whether the challenged law imposes a burden on conduct falling within the scope of

---

[15] *Heller*, 554 U.S. at 626.

[16] *Id.*

[17] *Id.* at 627 n.26; *see also Binderup*, 836 F.3d at 343 ("These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms." (citing *Heller*, 554 U.S. at 631, 635)); *United States v. Barton*, 633 F.3d 168, 171 (3d Cir. 2011) (list of presumptively lawful regulations reflects historical understanding of Second Amendment right), *overruled on other grounds by Binderup*, 836 F.3d at 349, 350.

the Second Amendment's guarantee."[18] If it does not, we need not proceed to the second step. If it does, however, we assess the law under heightened scrutiny.[19] Where the law survives heightened scrutiny, it is constitutional; if not, it is invalid.[20] In *Marzzarella*, we held that even if the law did impose a burden on protected conduct, in view of the government's interest in tracing weapons through serial numbers, the law survived intermediate scrutiny.[21]

A year later, in *United States v. Barton*, we heard a challenge to 18 U.S.C § 922(g)(1), the federal statute banning felons from gun possession.[22] In *Barton*, we determined that, even though felon dispossession statutes were presumptively lawful under *Heller*, § 922(g)(1) could still be challenged as it applied to individuals.[23] In evaluating such a challenge, we

---

[18] *Marzzarella*, 614 F.3d at 89.

[19] The *Heller* Court stopped short of announcing the level of scrutiny that applies when a law infringes on Second Amendment rights. It cautioned nevertheless that rational basis review would not suffice. 544 U.S. at 628 n.27 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment . . . would have no effect.").

[20] *Marzzarella*, 614 F.3d at 89.

[21] *Id.* at 95, 98-99.

[22] 633 F.3d at 173-75. In *Barton*, we also denied the challenger's facial attack of the statute "because *Heller* requires that we 'presume,' under most circumstances, that felon dispossession statutes regulate conduct which is unprotected by the Second Amendment." *Id.* at 172.

[23] *Id.* at 173.

turned to the traditional justifications underlying the § 922(g)(1) ban on gun possession by felons to determine whether these justifications supported permanent disarmament. This review was informed by the historical approach the Court applied in *Heller*. There, the Court explained that it would "expound upon the historical justifications for" presumptively lawful regulations "if and when those [regulations] come before [it]."[24]

In *Barton*, our historical review informed us that, traditionally, individuals who committed violent offenses were barred from gun possession; "the common law right to keep and bear arms did not extend to this group."[25] We then held that to successfully raise an as-applied challenge, the challenger had to distinguish his circumstances from those of persons historically-barred from possession of a firearm by demonstrating either (1) that he was convicted of a minor, non-violent crime and thus "he is no more dangerous than a typical law-abiding citizen"; or (2) that a significant time has passed so that he has been "rehabilitated" and "poses no continuing threat to society."[26] Applying this standard, we concluded that the challenger failed to distinguish his circumstances, which included prior convictions for possession of cocaine with intent to distribute and for receipt of a stolen firearm.[27] As a result, we held that the statute was constitutional as applied to him.[28]

---

[24] *Id.* (quoting *Heller*, 554 U.S. at 635).
[25] *Id.*
[26] *Id.* at 174.
[27] *Id.*
[28] *Id.* at 175.

Five years after *Barton*, in *Binderup*, we decided another as-applied challenge to § 922(g)(1), this time by two individuals, Daniel Binderup and Julio Suarez, seeking to distinguish themselves from the historically-barred class of felons. Many years earlier, the challengers had been convicted of potentially serious offenses, defined by the state as misdemeanors. They had since led lives free of criminal convictions, except for Suarez who had one conviction for driving under the influence of alcohol.[29] We were tasked with determining whether § 922(g)(1) was unconstitutional as applied to the challengers, given their "rehabilitation" after the offenses they had committed.

In deciding the as-applied challenge, we clarified the applicable test. We explained that, at step one of *Marzzarella*, a challenger "must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class."[30] If a challenger passes these two hurdles, "the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny . . . at step two of the *Marzzarella* analysis."[31]

In making this clarification, we overruled *Barton* insofar as, at the first step, it allowed a challenger to distinguish himself from a historically-barred class by demonstrating the

---

[29] *Binderup*, 836 F.3d at 340.
[30] *Id.* at 346-47 (internal citations omitted).
[31] *Id.* at 347.

11

passage of time or evidence of rehabilitation.[32]  As we noted in *Binderup*, the historical justification for disarming felons was that they were "unvirtuous," a term historically applied to individuals who had committed "serious" crimes.[33]  Where the historical justification for disarming felons was because they had committed serious crimes, risk of violent recidivism was irrelevant, "and the seriousness of the purportedly disqualifying offense is our *sole focus* throughout *Marzzarella*'s first step."[34]  We therefore emphasized that neither passage of time nor evidence of rehabilitation "can restore Second Amendment rights that were forfeited."[35]  After *Binderup*, the only way a felon can distinguish himself from the historically-barred class of individuals who have been convicted of serious crimes is by demonstrating that his conviction was for a non-serious crime, *i.e.*, that he is literally not a part of the historically-barred class.[36]

Three factors supported our conclusion that *Barton*'s emphasis on rehabilitation evidence was misplaced.  First, there was no historical support for the proposition that Second Amendment rights could be restored after they were forfeited, and historical context was the guiding principle for our Second Amendment analysis.[37]  Second, to the extent such a restoration remedy was available, it was a matter of

---

[32] *Id.* at 349.

[33] *Id.* at 348.

[34] *Id.* at 350 (emphasis added).

[35] *Id*.

[36] *Id.* at 349-50

[37] *Id.* at 350.

congressional grace.[38]  Third, and most importantly, we held that courts are "not 'institutionally equipped' to conduct 'a

---

[38] *Id.*  As Judge Fuentes explained in his concurrence, by a separate provision of the federal gun laws, 18 U.S.C. § 925(c), Congress provided an opportunity for individuals who were prohibited from possessing guns to apply to the Attorney General for "relief from the disabilities imposed by Federal laws." *Id.* at 402.  The Attorney General was given the power to "grant such relief if it is established to his satisfaction that the circumstances regarding the disability, and the applicant's record and reputation, are such that the applicant will not be likely to act in a manner dangerous to public safety . . .."  18 U.S.C. § 925(c).  Pursuant to the statute, an applicant who is denied relief by the Attorney General may petition a district court for relief.

This relief provision, however, has been "rendered inoperative" because Congress defunded this program in 1992, and an "embargo on funds has remained in place ever since." *Binderup*, 836 F.3d at 402-03 (Fuentes, J., concurring).  "Congress effectively wr[ote] § 925(c) out of the statute books" because it concluded that the task of granting individual applications was "a very difficult and subjective task which could have devastating consequences for innocent citizens if the wrong decision is made." *Id.* at 403 (quoting S. Rep. No. 102-353, at 19).  A House report also stated that "too many of these felons whose gun ownership rights were restored went on to commit violent crimes with firearms." *Id.* (citing H.R. Rep. No. 104-183, at 15).  Congress therefore concluded that a system for restoring gun rights was unworkable. *Id.*

13

neutral, wide-ranging investigation' into post-conviction assertions of rehabilitation."[39]

## II. Whether § 922(g)(4) Burdens Conduct Falling Within the Scope of the Second Amendment

Turning to the case before us and the constitutionality of § 922(g)(4) as applied to Beers, *Marzzarella* and *Binderup* require Beers to demonstrate that this statute burdens conduct protected by the Second Amendment. To do so, he must "(1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, and then (2) present facts about himself and his

---

[39] *Id.* at 350 (quoting *United States v. Bean*, 537 U.S. 71, 77 (2002)). After Congress defunded the § 925(c) restoration program described above, individuals barred from possessing firearms under federal law began filing suits asking federal district courts to review their restoration applications in the first instance. We ruled in *Pontarelli v. United States Department of Treasury* that Congress's denial of funds to process § 925(c) restoration applications stripped the federal district courts of jurisdiction to review the Justice Department's refusal to act on those applications. 285 F.3d 216, 230 (3d Cir. 2002). We also noted the institutional limitations and lack of resources of federal courts to conduct detailed investigations of applicants' backgrounds and their recent conduct. *Id.* at 230-31. The Supreme Court later confirmed this understanding in holding that the § 925(c) "inquiry into [an] applicant's background [is] a function best performed by the Executive, which, unlike courts, is institutionally equipped for conducting a neutral, wide-ranging investigation." *Bean*, 537 U.S. at 77.

background that distinguish his circumstances from those of persons in the historically barred class."[40]

Beers has not been able to do so. Even though he claims to be rehabilitated, Beers cannot distinguish himself from the historically-barred class of mentally ill individuals who were excluded from Second Amendment protection because of the danger they had posed to themselves and to others.

Section 922(g)(4) prohibits the possession of firearms by anyone "who has been adjudicated as a mental defective or who has been committed to a mental institution." The Code of Federal Regulations defines "adjudicated as a mental defective" to include, among other definitions, "[a] determination by a court, board, commission, or other lawful authority that a person, as a result of . . . mental illness . . . [i]s a danger to himself or to others . . .."[41] The Code defines "committed to a mental institution" as a "[f]ormal commitment of a person to a mental institution by a court, board, commission, or other lawful authority," including "commitment to a mental institution involuntarily" and "commitment for mental defectiveness or mental illness."[42] Because the Code has defined the terms employed in § 922(g)(4) and because Beers was committed involuntarily by the Pennsylvania court to a psychiatric hospital in conformity with 27 CFR § 478.11 and with 50 Pa. C.S. §§ 7302-7304, we conclude that Beers has properly been identified as a member of the class described in § 922(g)(4).

---

[40] *Binderup*, 836 F.3d at 346-47 (internal citations omitted).
[41] 27 C.F.R. § 478.11.
[42] *Id.*

To support our conclusion, we will review the traditional justifications for prohibiting the mentally ill from possessing guns in order to consider then if the imposition of the § 922(g)(4) ban is justified.

### A. The Traditional Justifications for Excluding Mentally Ill Individuals from Second Amendment Protections

Traditionally, individuals who were considered dangerous to the public or to themselves were outside of the scope of Second Amendment protection. Although laws specifically excluding the mentally ill from firearm possession did not begin appearing until later, such laws were not necessary during the eighteenth century.[43] At that time, judicial officials were authorized to "lock up" so-called "lunatics" or other individuals with dangerous mental impairments.[44] Thus, courts analyzing the traditional justifications for disarming the mentally ill have noted that "if taking away a lunatic's liberty was permissible, then we should

---

[43] *See* Carlton F.W. Larson, *Four Exceptions in Search of A Theory:* District of Columbia v. Heller *and Judicial Ipse Dixit*, 60 HASTINGS L.J. 1371, 13773 (2009).

The tools of deduction employed here to conclude that the mentally ill were historically-barred from gun ownership, where there is little evidence of *specific* historic prohibitions, are the same means we employed in *Binderup*. Indeed, laws prohibiting felons from gun possession were also relatively new. *See Barton*, 633 F.3d at 173.

[44] Larson, *supra* note 43, at 1377-78 (citations omitted).

find the 'lesser intrusion' of taking his or her firearms was also permissible."[45]

The historical record cited in *Binderup* supports this conclusion. In *Binderup*, we turned to the precursor to the Second Amendment, the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents. That Address states that citizens did not have a right to bear arms if they had committed a crime. The Address goes on to note that citizens were excluded from the right to bear arms if they were a "real danger of public injury."[46] We can therefore ascertain that the traditional justification for disarming mentally ill individuals was that they were considered dangerous to themselves and/or to the public at large.

## B.  Beers's Circumstances

Having identified the traditional justification for denying the mentally ill the right to arms—that they present a danger to themselves or to others—we now ask whether Beers has presented sufficient facts to distinguish his circumstances from those of members in this historically-barred class.[47] Beers's only bases for distinguishing himself, however, are that a substantial amount of time has passed since he was institutionalized and that he is now rehabilitated.

---

[45] *Jefferies v. Sessions*, 278 F. Supp. 3d 831, 841 (E.D. Pa. 2017) (quoting *Keyes v. Lynch*, 195 F. Supp. 3d 702, 718 (M.D. Pa. 2016)).

[46] *Binderup*, 836 F.3d at 349 (quoting 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 662, 665 (1971)).

[47] *Binderup*, 836 F.3d at 349.

17

We established in *Binderup* that neither passage of time nor evidence of rehabilitation "can restore Second Amendment rights that were forfeited."[48]  There was no historical support for the proposition that forfeited rights could be restored.[49]

In *Binderup*, we held that a challenger to § 922(g)(1) could distinguish his circumstances only by demonstrating that he was not convicted of a serious crime, but not by demonstrating that he had reformed or been rehabilitated.  We reached this conclusion after analyzing the historical underpinnings of such a ban, which indicated that individuals who had committed serious crimes were traditionally prohibited from gun possession.  Because the challengers in *Binderup* had not committed serious crimes, a ban on their right to bear arms was unconstitutional as it applied to them.  Passage of time and evidence of rehabilitation, however, had no bearing on whether the challengers were convicted of serious crimes.  Such evidence, therefore, was irrelevant in our analysis at step one.

Here, the historical underpinnings of § 922(g)(4) were to keep guns from individuals who posed a danger to

---

[48] *Id.* at 350
[49] *Id.*

18

themselves or to others.[50]  Beers was committed to a mental institution for this very reason:  he was suicidal, and a court determined that he was a danger to himself or to others.  The doctor who examined Beers noted that inpatient treatment was needed for Beers's safety.  Additionally, Pennsylvania courts extended Beers's involuntary commitment on two occasions.

Beers cannot distinguish his circumstances by arguing that he is no longer a danger to himself or to others. Acceptance of his argument would sidestep the ruling we made in *Binderup* that neither passage of time nor evidence of rehabilitation "can restore Second Amendment rights that were forfeited."[51]  Instead, the only way Beers can distinguish his circumstances is by demonstrating that he was never determined to be a danger to himself or to others.  This Beers cannot do.

Moreover, the reasons that justified disregarding passage of time or rehabilitation in *Binderup* apply here with

---

[50] In *Tyler v. Hillsdale County Sheriff's Department*, the Sixth Circuit reached the opposite result to the one we reach here, concluding that § 922(g)(4) burdened the Second Amendment rights of the challenger, an individual who was also involuntarily committed because of the danger he posed to himself or to others.  837 F.3d 678, 683 (6th Cir. 2016) (en banc).  In reaching that conclusion, the Sixth Circuit found lacking the historical support for prohibitions on the possession of firearms by the mentally ill.  *Id.* at 689-90.  For the reasons we have stated above, we disagree that there is an absence of historical evidence that mentally ill individuals, who were considered a danger to themselves or to others, were banned from possessing guns.

[51] *Binderup*, 836 F.3d at 350.

equal force. First, there is no historical support for such restoration of Second Amendment rights. In addition, as was the case in *Binderup*, federal courts are ill-equipped to determine whether any particular individual who was previously deemed mentally ill should have his or her firearm rights restored.[52]

Because Beers cannot distinguish his circumstances, we conclude that § 922(g)(4) as applied to him does not burden conduct falling within the scope of the Second Amendment.[53]

Nothing in our opinion should be read as perpetuating the stigma surrounding mental illness. Although Beers may now be rehabilitated, we do not consider this fact in the context of the very circumscribed, historical inquiry we must conduct at step one. Historically, our forebearers saw a danger in providing mentally ill individuals the right to possess guns. That understanding requires us to conclude that § 922(g)(4) is constitutional as applied to Beers.

---

[52] *Id. See supra* n.39. We realize that state courts participate in the involuntary commitment of mentally ill persons who are a danger to themselves or to others, see, *e.g.*, 50 Pa. C.S. § 7302. The federal courts do not, however, participate in such commitments, nor do they have the resources to conduct detailed investigations of an individual's mental state or his recent conduct. *Cf. Pontarelli*, 285 F.3d at 230-31 (holding that, in regard to restoration of gun right to felons, federal courts lack resources to conduct detailed investigations of applicants' background and their recent conduct.)

[53] Beers therefore fails to surpass the first step of our Second Amendment framework, and we need not proceed to step two.

## CONCLUSION

For the foregoing reasons, we will affirm the judgment of the District Court.